Leonard S. GOODMAN et al., Plaintiffs,

v.

PERPETUAL BUILDING ASSOCIATION et al., Defendants.

Civ. A. No. 2720–66.

United States District Court, District of Columbia.

April 10, 1970.

James A. Welch, John L. Ridge, Jr., and H. Mason Welch, of Welch, Daily & Welch, Washington, D. C., for plaintiffs.

Thomas S. Jackson, and Austin P. Frum, of Jackson, Gray & Lasky, Washington, D. C., for defendant perpetual Building Association.

John J. Wilson, and Frank H. Strickler, of Whiteford, Hart, Carmody & Wilson, Washington, D. C., for nine individual defendants and Fidelity Investment Co.

## MEMORANDUM OPINION

WADDY, District Judge.

In this case the plaintiffs who are investing and borrowing members of Perpetual Building Association, sued said Association, its nine directors individually, and the Fidelity Investment Company, a partnership, all of the general partners of which are the same directors of Perpetual, for injunctive and other relief. All of plaintiffs' claims with the exception of one were disposed of by Judge George L. Hart of this Court by order dated March 7, 1968, granting partial summary judgment for all of the defendants. Plaintiffs' remaining claim is that: "Fidelity receives and unlawfully retains commissions for writing insurance on property securing the repayment of loans made by Perpetual." They predicate their claim upon the contention that the directors of Perpetual have unlawfully deprived Perpetual of a "corporate opportunity" * and violated their fiduciary duty by failing to qualify Perpetual to place hazard insurance on loans made by it and receive commissions therefor and by diverting such business to Fidelity. It is the position of the defendants that:

(1) Plaintiffs have no standing to maintain this suit;

(2) Plaintiffs have not exhausted their administrative remedies;

(3) The doctrine of primary jurisdiction requires that this matter be first considered by the Federal Home Loan Bank Board;

(4) That it would be ultra vires for Perpetual to take out insurance license;

(5) That District of Columbia law precluded and still precludes Perpetual from engaging in the insurance business as agent or broker.

---

* Although Perpetual Building Association is unincorporated the principle prohibiting the usurpation by a fiduciary of a "business" or "corporate opportunity" is relied upon.

The cause came on to be heard by the Court sitting without a jury and the first three contentions of the defendants were the subject of a motion made at the beginning of the trial by Perpetual, joined in by the nine directors, to dismiss the complaint. This motion was overruled by the Court and reasons were stated on the record. The Court having now considered the evidence adduced at trial, the memoranda of the parties and the arguments of counsel, sets forth in this Memorandum Opinion its Findings of Fact and Conclusions of Law.

This is a derivative suit in the nature of a class action maintainable under Rule 23(a) and (b) (2) of the Federal Rules of Civil Procedure brought by two plaintiffs, Leonard S. Goodman and Barbara L. Goodman, his wife. Plaintiffs and the class they represent are investing and/or borrowing members of Perpetual Building Association. Plaintiffs have been investing (depositing) members of defendant Perpetual Building Association (hereinafter "Perpetual") since October 6, 1964, and borrowing members of Perpetual since August 16, 1962.

The defendant Perpetual, is a voluntary unincorporated association of depositing and borrowing members organized in 1881 under the laws of the District of Columbia and engaged in the business of a building and loan association in the District of Columbia and, since about 1949, in Maryland, maintaining offices in both jurisdictions. Although Perpetual does not maintain an office in the State of Virginia, it does make loans which are secured by first deeds of trust on properties located in the State of Virginia. The Virginia State Corporation Commission has stipulated with Perpetual that the above-described Virginia-related activities of Perpetual do not constitute doing business in Virginia.

The defendant Fidelity Investment Company (hereinafter "Fidelity") is a partnership engaged in the business of managing properties, making short term loans, and acting as an insurance agent or broker in the District of Columbia, Maryland and Virginia. Fidelity was organized in 1947. It is the successor to the Fidelity Mortgage and Investment Company (hereinafter referred to as "Fidelity Corporation"), a Delaware corporation that was organized on May 31, 1927, at the suggestion of the defendant, Edward C. Baltz, who was then Perpetual's Assistant Secretary and a director, and who is the present Chairman of Perpetual's Board of Directors. Prior to its dissolution on January 1, 1947, Fidelity Corporation conducted a general real estate business, which included acting as a licensed insurance broker in the District of Columbia. During its existence each of the stockholders of Fidelity Corporation was also a director of Perpetual.

The nine individual defendants are members of and together comprise the entire Board of Directors of Perpetual. These same nine individual defendants are also general partners of Fidelity. Fidelity has no other general partners. Over the years as the directors of Perpetual have changed, the partners of Fidelity have similarly changed. As general partners, the nine individual defendants provide Fidelity with general supervision and share equally in the net profits earned by Fidelity from all sources of business conducted by that partnership, including business generated through Perpetual.

Seven of Perpetual's nine directors have met informally on a daily basis for a number of years to discuss matters of importance to the Association. Formal meetings of the Board of Directors are held once a month. The minutes of such monthly meetings do not include discussions since, as a general rule, only the actions taken are recorded.

Perpetual is comprised of approximately 140,000 depositing members and 30,000 borrowing members. Each member has only one vote even if he has more than one account and regardless of the amount he may have on deposit, and even if he is both a depositing and a borrowing member. Only the depositing

members are paid dividends from the profits of the Association. Pursuant to its By-Laws a meeting of the members is held once a year, and is normally attended by one hundred (100) to one hundred-fifty (150) members.

The By-Laws of Perpetual provide also that:

"I. Meetings of Members

"2. Special meetings of the members shall be held upon call by the Board of Directors or upon written request to the Board of Directors signed by fifty members in good standing which shall state the object and purpose for which the special meeting is requested.

"3. The members present, in person or by proxy, at any meeting of members shall constitute a quorum for the transaction of business.

"4. The time and place of the annual meeting of members shall be advertised for three successive days in two local newspapers, all of which days shall be more than seven days before the date of the meeting.

"5. The time and place of any special meeting of members shall be advertised in the same manner as annual meetings, but the advertisement of a special meeting shall state the object and purpose for which the special meeting is called.

＊　　＊　　＊　　＊　　＊　　＊

"9. Any members desiring to do so may give a proxy which shall be in writing, and which shall be filed with the Executive Committee of the Association at least thirty days before the date of the meeting at which it is used, and which shall be valid and remain in force until revoked in writing by the grantor ＊ ＊ ＊."

The individual members of the Board of Directors of Perpetual hold approximately 48,000 proxies.

Prior to the institution of this action neither plaintiff had ever attended an annual meeting of Perpetual; nor had either ever in writing or verbally brought their complaint to the attention of Perpetual. Neither plaintiff made any effort to determine the attitude of the members with respect to the matter in question or to call their grievances to the attention of the membership. The Court finds, however, that in view of the negative positions of the directors with respect to the matters complained of by the plaintiffs and by virtue of the extremely small turnout of members to shareholder meetings in relation to the size of the membership as well as the great number of proxies held by the same interested directors, an appeal by the plaintiffs to the Board of Directors and/or to the membership in order to secure the changes they desired would have been useless, and therefore a futile act.

Perpetual was established in 1881. It makes first mortgage, monthly reduction loans secured by real property. It has known constant growth and its assets were approximately $555,000,000 in 1969.

In connection with its loans Perpetual requires its borrowing members to obtain and pay for hazard insurance to protect Perpetual's security, all as provided in the deed of trust executed by the borrower. The borrower may select his own insurance carrier or he may authorize Perpetual to arrange for the placing of the insurance. At the time he executes the Deed of Trust securing the loan the borrowing member is advised by a Perpetual employee that "Fidelity Investment Company ＊ ＊ ＊ is a business made up of the Directors of Perpetual Building Association and that it places hazard insurance." If the borrower does not select an insurance agent or broker Perpetual will arrange for the placement of the insurance. In recent years it has been the practice of Perpetual to place the major portion of the hazard insurance not otherwise placed by the borrower through Fidelity, which receives a commission from the insurance company with which the risk is placed. No portion of such commissions is paid to Perpetual. The general partners of Fidelity, however, share equally

in all of the profits of the partnership. If the borrower selects an agent or broker other than Fidelity, Fidelity receives no commission on the insurance written to cover that particular property.

Fidelity is a qualified (licensed) policy writing agent and insurance broker in the District of Columbia and it acts as agent or broker on hazard and other insurance related to some first mortgage loans made by Perpetual and others on properties located in the District of Columbia for which it receives commissions. Fidelity has policy-writing authority from three major insurance companies. Fidelity does not write certain forms of multi-peril insurance, but it does refer requests for such coverage to other brokers and it handles all inquiries and contacts concerning such insurance.

Perpetual maintains an "Insurance Department" which, before a loan is disbursed, approves the insurance company assuming the hazard insurance, and the amount of insurance and maintains a tickler card file and copies of all insurance policies currently in force. The basic purpose of this department is to make sure that the properties securing Perpetual loans are continuously protected by adequate insurance. When a borrower does not obtain his own insurance, Perpetual's Insurance Department forwards to Fidelity a completed form entitled "Insurance Order" which contains the information necessary to obtain insurance coverage. Fidelity thereupon writes or brokers the required insurance for which it receives a commission. Once a month Fidelity is billed by the insurance companies for the premiums on business written during the month. On business generated through Perpetual, Perpetual collects and remits the full premiums to Fidelity as same are due and Fidelity reconciles the amounts remitted by Perpetual with the insurance company invoices, deducts its commission and pays the premiums due.

Perpetual is not now and there is no evidence that it has ever been licensed as an insurance agent or broker in the District of Columbia, Maryland or Virginia, or elsewhere. Perpetual's Board of Directors have been advised by its attorneys (who have also been members of its Board of Directors) that Perpetual cannot legally be licensed as insurance agent or broker in either of the three jurisdictions and that it would be ultra vires for Perpetual to act as insurance agent or broker.

Although Perpetual has never been licensed as an insurance agent or broker in the District of Columbia or elsewhere the evidence does establish that beginning as early as 1912 and continuing up to and including the year, 1935, Perpetual arranged the placing of insurance on property securing its loans and was paid all or a portion of the commissions for the placing of such insurance. Perpetual's records show receipt of the following insurance commissions during this period:

| Year Ending Oct. 20 | Commission on Insurance | Loans |
|---|---|---|
| 1912 | $ 750.92 | $ 2,954,621.00 |
| 1913 | 1205.76 | 3,318,668.25 |
| 1914 | 1182.79 | 3,586,511.00 |
| 1915 | 1124.95 | 3,761,364.75 |
| 1916 | 1352.96 | 3,877,096.25 |
| 1917 | 2105.68 | 4,082,456.00 |
| 1918 | 1896.54 | 4,375,680.25 |
| 1919 | 2945.53 | 5,123,830.25 |
| 1920 | 5609.89 | 6,051,401.25 |
| 1921 | 4247.50 | 6,477,044.00 |
| 1922 | 6665.74 | 7,521,302.25 |
| 1923 | 6790.55 | 8,152,765.00 |
| 1924 | No record | 8,809,557.75 |
| 1925 | 8455.88 | 10,153,152.00 |
| 1926 | 9591.34 | 12,413,015.50 |
| 1927 | 11268.98 | 15,398,435.50 |
| 1928 | 4380.35 | 17,658,321.50 |
| 1929 | 3512.31 | 19,754,324.00 |
| 1930 | 2631.03 | 21,899,097.50 |
| 1931 | 3235.12 | 25,220,292.50 |
| 1932 | 3292.78 | 28,836,265.00 |
| 1933 | 2018.11 | 30,021,832.50 |
| 1934 | 3563.92 | 31,956,545.00 |
| 1935 | 2610.59 | 36,127,488.77 |

In 1935 Perpetual's directors decided to remove Perpetual from the insurance

brokerage business and since that time it has received no insurance commissions.

Prior to 1925, Arthur Carr, a director and appraiser of Perpetual, was a recipient of an unknown amount of commissions on insurance generated through Perpetual and placed with Fireman's Insurance Company of Washington which commissions he retained for himself.

Defendant, Edward C. Baltz, has been associated with Perpetual for 61 years. He was elected Assistant Secretary in 1925; became a member of the Board in 1926; elected Secretary in 1930; President in 1950; and Chairman of the Board of Directors in 1966. He is the only surviving member of the Perpetual Board of Directors as it existed in 1927 and 1935.

In 1927, Mr. Baltz proposed the formation of Fidelity Mortgage and Investment Company and, after discussion with other directors, that company (herein sometimes called "Fidelity Corporation") was organized as a Delaware Corporation on May 31, 1927. In that same year the defendant, Baltz, authorized the person in charge of the Perpetual Insurance Department to refer insurance business generated from Perpetual's borrowers to Fidelity Corporation. This person was given great discretion in determining the business to be referred to Fidelity Corporation. Fidelity Corporation began to receive such referrals from Perpetual in 1927 and retained the insurance commissions earned as a result of the placements. Fidelity Corporation's insurance commission income from this source began in 1928. Its total commission income for that year was Thirteen Thousand Seven Hundred and Sixty-Eight ($13,768.00) Dollars and the amount of such income has increased.

The records produced at trial do not show the total dollar amounts of insurance commissions earned by Fidelity Corporation or the relationship of such commissions to the business generated through Perpetual for the entire period from 1927 to the date of trial.

The records that were produced do show the dollar amounts of insurance commissions on properties securing Perpetual loans and properties owned by Perpetual and the percentage of Fidelity's business represented by such commission during the following years:

| Year | Amount of Commission | Approximate % of Fidelity's gross income which such insurance commissions constituted |
|------|------|------|
| 1950 | 68,546.76 | 73.09% |
| 1963 | 133,537.94 | 61.86% |
| 1964 | 214,292.56 | 76.94% |
| 1965 | 209,172.47 | 72.15% |
| 1966 | 198,307.33 | 69.56% |
| 1967 | 219,977.43 | 68.14% |

Perpetual's records show that beginning in 1921 its income from insurance commissions increased annually up to and including the year 1927. However, the year after the formation of Fidelity Corporation and the inauguration of the practice of referring the insurance business to Fidelity Corporation, Perpetual's income from insurance commissions dropped from $11,268.98 in 1927 to $4,380.35 in 1928, and was less than $4,000.00 each year thereafter until 1935, after which it ceased completely.

The Court considers it to be a reasonable inference and finds as a fact from all of the circumstances in evidence that the major portion of the sharp drop in insurance commissions received by Perpetual from the year 1927 to the year 1928 and the continued lower level of insurance commission income up to and including the year 1935 when it ceased altogether resulted directly from Perpetual's commencing and continuing to refer a substantial portion of its insurance business to Fidelity Corporation.

Perpetual's Constitution and By-Laws do not expressly authorize it to engage in nor prohibit it from engaging in the insurance agency or brokerage business. Article III of its Constitution grants to the association the power to "* * * lend its capital and other funds, * * * to conduct the business of a building and loan association

within the territory of the United States of America, to purchase, hold, convey, mortgage and lease real and personal property for purposes consistent with its objects and powers, * * * *and, in addition, to do all things reasonably incident to the accomplishment of its objects and the exercise of its powers and as may be permitted by the laws to which it is subject.*" (Italics supplied).

Article VIII of the By-Laws of Perpetual provide:

"3. Special Facilities. For the convenience of members of the Association and the general public and when authorized by the Board of Directors the Association may maintain and lease or rent safe deposit boxes, sell and redeem savings bonds of the United States Government, receive payments of tax bills when authorized to do so by the taxing authority, receive payments of monthly debits of public utility companies, sell travelers' checks on consignment from the issuer thereof and provide other facilities which are provided by federal associations or those organized and doing business under the laws of the District of Columbia or any state in which this Association has an office."

This Court finds and concludes that the above-quoted constitutional and by-law provisions constitute a grant of power to Perpetual to engage in reasonable incidental activities beneficial to itself and its members and that qualifying for and placing of hazard insurance to protect Perpetual's security on loans made by it to its members was and is one of such incidental activities.

Perpetual is not now and never has been chartered as a "federal savings and loan association" under the Federal Home Loan Bank Act, but in the early 1930's it became a member of the Federal Home Loan Bank System and since 1950 its accounts have been insured by the Federal Savings and Loan Insurance Corporation. In 1930 the bank for the Federal Home Loan Bank System for the region covered by the District of Columbia was headquartered at Winston-Salem, North Carolina.

Defendant Baltz became a Director and Vice Chairman of the Board of Directors of the Winston-Salem Bank which, under the System, recommended regulations to the Federal Home Loan Bank Board. One recommendation was that federal savings and loan associations should not be allowed to engage in the insurance business. About 1933, the Federal Savings and Loan Association System was established and federally chartered associations [hereinafter "federals"] from that time to the present have been forbidden by the Federal Home Loan Bank Board to act as agent or broker for the sale of insurance. This prohibition was not applicable to Perpetual inasmuch as Perpetual was *not* a "federal".

Although defendant Baltz testified that he was always of the opinion that all during the period that Perpetual was placing insurance and receiving commissions therefor it was acting unlawfully and was receiving illegal "kickbacks", it is significant that defendants have offered no explanation and there is no direct evidence in the record as to why in 1927 the decisions were made to create Fidelity Corporation and to authorize referral of insurance business generated by Perpetual to that company, thereby resulting in a *decrease* but not a *cessation* of Perpetual's insurance commission income. However, after the Winston-Salem recommendation concerning "Federals", defendant Baltz informally discussed the subject of Perpetual's continuing to receive insurance commissions with Perpetual's then General Counsel, Mr. Arthur G. Bishop. Such discussions took place over a period of a couple of years. Bishop advised that Perpetual could not lawfully engage in the business of insurance broker or agent; that to do so would be ultra vires, and that the commissions Perpetual was then receiving were "kickbacks" and illegal. Based upon Mr. Bishop's advice, Mr. Baltz decided to and directed in 1935

that Perpetual stop its practice of placing insurance and accepting insurance commissions. The other directors acquiesced in the action of Mr. Baltz.

Significantly, the decision to organize Fidelity Corporation in 1927 for the purpose of acting, among other things, as an insurance agent or broker; the decision that same year to have Perpetual place insurance through Fidelity Corporation, as well as the decision in 1935 that Perpetual itself should forego entirely the receipt of any insurance commissions, and not apply for an insurance license, were all made by the defendant, Edward Baltz. There is no evidence of any objection by any member of the Board of Directors of Perpetual as it was then constituted, or since constituted as to any decision, order or action of the defendant, Baltz, relating in any manner to Perpetual's engaging in the insurance business and the referring of insurance business to Fidelity. The Court finds, however, that all of said decisions or orders and actions were known to the other directors and were ratified, either expressly or impliedly by all of the members of Perpetual's Board of Directors at times when they were also the general partners of Fidelity.

According to Mr. Baltz the decisions to remove Perpetual from the insurance business in 1935 resulted in part from the Winston-Salem discussions; in part from Mr. Bishop's advice that the acceptance of the insurance commissions was ultra vires and violative of the District of Columbia Code, and, in part, from the belief of the then directors that although Perpetual was not a "federal" it should mirror the policies and practices of the "federals" with respect to insurance.

At the time Mr. Bishop rendered his legal opinion he was, in addition to General Counsel, a director of Perpetual and a stockholder in Fidelity Corporation. He was a stockholder in Fidelity Corporation from its inception and later a general partner in Fidelity. At no time during the period of those discussions did he, Mr. Baltz, or the Perpetual Board of Directors obtain or seek independent legal advice as to whether Perpetual could obtain a license and legally act as insurance agent or broker. Nor was any attempt made to obtain in insurance license for Perpetual.

The current General Counsel for Perpetual is the defendant, Samuel Scrivener, Jr. He is also a director of Perpetual and a partner in Fidelity. He began his association with Perpetual in 1944, and has been its General Counsel since about 1949. In addition he is Vice Chairman of Perpetual's Board of Directors and Vice Chairman of its Executive Committee. In 1954, as the result of a then unexplained investigation of the records of Perpetual and Fidelity relating to insurance by the Federal Bureau of Investigation, Mr. Scrivener reviewed the question of the legality of Perpetual's engaging in the insurance business. It was subsequently learned that the Federal Bureau of Investigation was looking to see if Perpetual was imposing an illegal insurance tie-in requirement in connection with its loans. No criticism of any kind resulted from the investigation. Mr. Scrivener concluded that it would be illegal for Perpetual to engage in the insurance business in the District of Columbia and Maryland and unwise to do so in Virginia and he so advised Perpetual's Board of Directors. Since that time he has continued to so advise his fellow directors, and at the trial of this case he testified that he still adheres to that opinion. Expressions of this opinion by Mr. Scrivener and discussions concerning Perpetual engaging in the insurance business occurred in 1955 at the time the Bethesda-Chevy Chase Federal Savings and Loan Association was merged with Perpetual; in 1954 when the Anacostia Federal Savings and Loan Association was merged with Perpetual; in 1959 when Progressive Federal Savings and Loan Association was merged with Perpetual; in October, 1965 after Perpetual received a copy of a letter of Mr. Boros, then plaintiffs' counsel, to the Federal Home Loan Bank Board and in the for-

mulation of the position and opinion expressed in Mr. Scrivener's letter of December 17, 1965 in reply to Mr. Mondell, Regional Supervisor of the Federal Home Loan Bank Board which was read to and concurred in by Perpetual's Board of Directors. The whole subject was again reviewed by Perpetual's directors when this suit was filed in October, 1966. Each time the matter was considered by any of the directors it was determined that Perpetual should not engage in the insurance business in any of the three jurisdictions.

Neither Mr. Scrivener nor the Perpetual Board of Directors consulted independent counsel with respect to the question of Perpetual's engaging in the insurance business, nor did either of them attempt to obtain a license to permit Perpetual to broker insurance.

It is the contention of the nine individual defendants that it is unlawful for Perpetual to conduct a licensed insurance business incident to its business as a building and loan association and collect commissions therefor. They claim that no expressed authority to engage in such insurance business was granted by either the District of Columbia Building Association Act (26 D.C. Code (1967 Ed.) 401) or by Section 654 of the 1901 District of Columbia Code and that the language found in Section 1336 of the current Code (35 D.C.Code (1967 Ed.) 1336) precludes Perpetual from obtaining a license for such purpose. This Court finds that the above-mentioned statutes have never precluded and do not now preclude Perpetual from obtaining a license and conducting the business of an insurance agent or broker in the District of Columbia as an incident to its primary business of a building and loan association.

The District of Columbia Building Associations Act, supra, provided for the incorporation of building associations and gave them power of, among other things, "* * * purchasing, holding, and conveying such real estate as may be necessary to the conduct of its business, *and to make reasonable by-laws not inconsistent herewith.*" (italics supplied). It also exempted building associations organized and in actual operation before March 4, 1909, from the requirement of incorporation. (26 D.C. Code (1967 Ed.) §§ 401, 404).

Section 654 of the 1901 District of Columbia Code provided in pertinent part:

"SEC. 654. INSURANCE AGENTS. —No person, *firm*, or corporation shall act as agent for any insurance company or association, or act as insurance broker or agent for procuring or placing insurance for commissions, compensation, gain, or profit, without first having obtained a license as an insurance agent or broker from the superintendent of insurance of the District. * * * No person, *firm*, or corporation, or *association* shall allow or pay any commission, rebate, or compensation whatever, directly or indirectly, to, for, or in behalf of any person, firm, or corporation doing business in the District of Columbia not licensed as herein provided. Any violation of this section shall be a misdemeanor and, on conviction in the police court of said District, be subject to the penalties provided in section six hundred and forty-eight aforesaid for the misdemeanors therein described: Provided, That licenses to *firms*, corporations, or *associations* shall be held to extend only to the bona fide co-partners, not exceeding two in one firm, and to the secretary and one assistant secretary of each corporation or association so licensed, any one of whom may be held and dealt with on behalf of such firm, corporation, or association for any violation of the provisions hereof * * *." (italics supplied).

From 1940 to present, the Fire and Casualty Act of the District of Columbia, (35 D.C.Code (1967 Ed.) § 1336) has been the statutory authority for issuing licenses to act as agent or broker of fire and casualty insurance in the

District of Columbia. The pertinent language of the statute provides:

"Any person hereafter desiring to engage in business in the District as a policy-writing agent, soliciting agent, broker, or salaried company employee, as defined by this chapter shall, before engaging in such business, secure from the Superintendent a license authorizing him to engage in such business. The person to whom the license may be issued shall file sworn answers, subject to the penalties of perjury, to such interrogatories as the Superintendent may require. * * * *Licenses may be issued in the name of individuals, or in the names of firms, partnerships, or corporations, including banks, trust companies, real-estate offices, and building and loan associations*: * * * Provided * * * no person shall be licensed as agent, broker, or salaried company employee when it appears to the Superintendent that said license is sought *primarily* for the purpose of obtaining commissions on policies * * * *on which the premiums are paid or are to be paid by any person who receives or is to receive any benefit, direct or indirect, from the commissions obtained,* * * *.*" (italics supplied).

Also pertinent is 35 D.C.Code (1967 Ed.) § 1340 which provides:

"The Superintendent may revoke or suspend the license of any policy-writing agent, soliciting agent, broker, or salaried company employee when and if, after investigation, it appears to the Superintendent that * * *

"(e) *more than 25 per centum of his commission income* from business to which the license applies results from policies the premiums on which are paid or are to be paid in the manner set forth in paragraph (f) of this section; or that

"(f) said license is being used *primarily* for the purpose of obtaining commissions on policies * * * *on which the premiums are paid or are to be paid by any person who receives or*

*is to receive any benefit, direct or indirect, from the commissions obtained,* * * *.*" (italics supplied).

There are no records of the District of Columbia Insurance Department which show whether insurance agent/broker licenses were issued to building and loan associations prior to 1940. The only evidence in the record that insurance licenses were issued by the District of Columbia Insurance Department to building and loan associations prior to 1940 is the testimony of Albert F. Jordan, Superintendent of Insurance for the District of Columbia. Mr. Jordan has held his position since August 1, 1939 and has been employed by the District of Columbia Department of Insurance since September, 1937. He testified that his best recollection was that licenses were issued to building and loan associations in the District of Columbia prior to 1940. However on cross-examination he conceded that he was unsure whether the licenses were issued to building and loan associations as such or were issued to individuals connected with building and loan associations.

As noted above, however, Section 654 prohibited any "person, *firm* or corporation" from acting as insurance broker or agent without a license from the Superintendent of Insurance for the District. It also contained a proviso "that licenses to *firms, corporations, or associations* shall be held to extend only to the bona fide *copartners*, not exceeding two in the firm, and to the secretary and one assistant secretary of each corporation *or association so licensed*, any one of whom may be held and dealt with *on behalf of such firm*, corporation or *association* for any violation of the provisions hereof * * * *.*" (All italics supplied). From the above, it appears clear to this Court that the term "firm" as first used in the statute was intended to and did include partnerships and unincorporated associations. Otherwise, the use of both of those terms in the proviso is meaningless. Furthermore, the proviso speaks of the "association so licensed" and that

the designated secretary or assistant secretary "may be held and dealt with on behalf of such * * * association" This interpretation of Section 654 is consistent with Mr. Jordan's recollection that prior to 1940 licenses were issued to building and loan associations and also is explanatory of his uncertainty as to whether they were issued to the associations as such or to individuals connected therewith.

■ A comparative glance at the language of Section 654:

"No person, firm, or corporation shall act * * * without first having obtained a license * * *."

and the proviso therein including the term "association", with the language of the Fire and Casualty Act of the District of Columbia, *supra*, enacted in 1940:

"Licenses may be issued in the name of individuals, *or in the name of firms, partnerships, or corporations, including * * * building and loan associations * * **."

indicates that the general statutory definition of the types of entities that may be licensed to act as fire and casualty hazard insurance agents and brokers in the District of Columbia is basically the same in both statutes and the change of language in the 1940 statute is merely in clarification of the previous ambiguous language contained in Section 654. Cf. Bailey v. Clark, 21 Wall. (88 U.S.) 284, 22 L.Ed. 651 (1874). Further support for this view may be found in the written statement of Lawrence C. Crawford, President, Insurers Association, dated May 16, 1940 to a subcommittee of the Senate Committee on the District of Columbia considering the 1940 legislation, as well as in his oral statement to that body on May 17, 1940. He wrote:

"With reference to the request that that portion of the bill authorizing banks, trust companies, real estate offices, and building and loan associations to do business be deleted, this is highly impractical and unnecessarily restrictive. *These organizations are already in the insurance business in the District of Columbia and any attempt to legislate them out will be unfair and unwise* and would certainly result in killing the proposed legislation." Hearing on S. 3500 and H. R. 9722 Before the Subcomm. of the Senate Comm. on the District of Columbia, 76th Cong., 3d Sess. 20 (1940) (hereinafter cited as Hearing), p. 26. On May 17, 1940, he stated:

"MR. CRAWFORD. *Line 25 specifically permits licenses to be issued in the names of* individuals, banks, trust companies or *building and loan associations*.

"*There is no effort to legislate these people out of business*—it can't be done—and we frankly don't think there is any use to make any effort to do it." (Id. at 16) (all italics supplied).

Upon consideration of all of the above this Court concludes as a matter of law that during the period 1901 to 1940 unincorporated associations could lawfully have been licensed as agents and brokers of fire and casualty insurance in the District of Columbia and that had Perpetual applied for an insurance license during this period, the District of Columbia Superintendent of Insurance could not have denied it on the basis of lack of statutory authority. The Court further concludes that had Perpetual applied for and received such an insurance license during this period, Perpetual would not have been illegally licensed.

■ It is clear from Section 1336 (35 D.C.Code 1967) that the Superintendent of Insurance is expressly authorized to issue fire and casualty hazard insurance licenses in the name of building and loan associations. Notwithstanding this fact the nine individual defendants contend that this grant is meaningless because of the proviso:

"No person shall be licensed as agent, broker, or salaried company employee when it appears * * * that said license is sought primarily for the purpose of obtaining commissions on

policies on which he on his own account pays or is to pay the premiums, or on which the premiums are paid or are to be paid by any person who receives or is to receive any benefit, direct or indirect, from the commissions obtained, * * *."

and the similar language in Section 1340 of the same statute which language has been incorporated as Question 18 of the application to the Superintendent of Insurance for a Broker-Agent license. These defendants argue that there is an indirect benefit to members of a building and loan association by virtue of an increase in the association's income and assets and that insurance commission income would indirectly benefit those members paying the insurance. This Court finds otherwise and concludes that the statute does not preclude the issuing of an insurance agent's or broker's license in *all* instances where the license is sought to obtain commissions on policies on which the premiums are paid or to be paid by a person who receives or is to receive a direct or indirect benefit. Licenses are to be withheld under this proviso only where such license is sought *primarily* for the restricted purposes. This conclusion is consistent with the obvious construction of the statute by the District of Columbia Superintendent of Insurance who is charged with the duty of administering the statute. In Question No. 18 on the Application for Broker-Agent License he has applied the 25 per cent rule of Section 1340 to disqualify applicants where the "premiums are paid or due to be paid by any person who receives or is to receive any benefit, direct or indirect, from the commissions obtained" as well as to situations where the applicant's commission income will result from policies on which he on his account pays or is to pay the premium. Thus it appears that the Superintendent considers the term "primarily" as used in the statute as meaning more than 25 per cent of the commission income. As will be hereinafter shown there is no evidence in this record to establish that more than 25

per cent of any insurance commissions that might have been or may be earned by Perpetual would have or will indirectly benefit those members paying the insurance premiums. The primary purpose of Perpetual obtaining a license to sell or place fire and casualty insurance on properties would be found in the exercise of its incidental power to protect its security while at the same time providing some income to the Association. Its primary purpose would not be to place insurance on property owned by it. Perpetual could still place such insurance through another agent or broker. The fact that the legitimate purpose would also afford an opportunity to obtain some income in the nature of commissions would not, standing alone, preclude the association from obtaining a license or render illegal its placing of insurance as further security on properties on which it holds a lien.

In reaching its conclusion the Court has taken into consideration also the purpose of the pertinent provisions of the sections of the Code mentioned heretofore. Their purpose was to outlaw *rebates* not to exclude building and loan associations from obtaining licenses and collecting commissions. There was placed in evidence at the trial of this cause Plaintiffs' Exhibit 24, which is the transcript of the hearings on the bill before the subcommittee of the Senate Committee on the District of Columbia on May 17, 1940, relating to the 1940 statute. In that transcript there appears the record of a colloquy among Senator McCarran, Mr. Jordan, the District Superintendent of Insurance, and Mr. Lawrence C. Crawford, President of Insurers Association. The bill had been prepared with the participation of Mr. Jordan, Mr. Crawford, and others. In explaining the provisions of the bill to the subcommittee Mr. Crawford stated:

"Mr. CRAWFORD. Now, page 39, line 3. There is a requirement there that, in order to obtain a license, it must be shown that more than 25 percent of the man's commission income

will probably come from insurance on his own or his employer's property.

"*That is to prevent what is practically a rebate* by the appointment of employees as insurance agents for the purpose of writing insurance on their employer's property. It is devastating to the agency system and it is devastating to the insurance business as a whole, and is not in the interests of the public.

"Why one man should be enabled to buy insurance more cheaply by appointing his bookkeeper as an agent, while the man over here, who does business through the American agency system, pays more for it, is obviously an unfair situation."

"Mr. JORDAN. That is being done now."

"Mr. CRAWFORD. Oh, it is being done widespread now—widespread * * *." Hearing at p. 15,

and further:

"Page 40, line 17, prohibits the licensing of persons who write primarily on their own or the property of their employers.

"That was referred to in the past and *it is simply an effort to prevent what is in effect a rebate.*" Id. at 16 (italics supplied).

Clearly the evidence in this case does not establish that commissions to Perpetual for writing or placing of insurance on property on which it has loaned money is a rebate contemplated by the above-mentioned language. Indeed, it is questionable whether the proviso applies to building and loan associations as such. There is a clear recognition in the legislation that building and loan associations are entitled to licenses in their own name. The prohibition of the proviso is upon *persons and salaried company employees.* In this regard, plaintiffs, on page 19 of their brief, have aptly stated:

"Legislative policy is set forth in a general enactment, not in a proviso. A proviso must therefore be strictly construed if used to determine legislative intent * * *",

citing 2 Sutherland, Statutory Construction, Section 493, page 471. See also, Commonwealth of Pennsylvania v. Brown, 260 F.Supp. 323 (Pa.1966), where the Court stated that provisos "* * * are qualifiers, not nullifiers".

The above interpretation of the statute finds support in Question 18 on the Application for Broker-Agent License, which reads as follows:

"Will more than 25 percent of your commission income result from policies on which you on your account pay or are to pay the premiums, or on which the premiums are paid or are to be paid by any person who receives or is to receive any benefit, direct or indirect, from the commissions obtained, or on which the premiums are paid or are to be paid by any partnership, association, or corporation of which you are a member?"

The above language of Question 18 is taken directly from 35 D.C.Code, Section 1340. The District of Columbia Insurance Department will not approve an application which answers Question 18 "Yes". Such applications are returned to the applicant.

Defendant Scrivener testified that he has always been of the opinion that the provisos set forth in Section 1336 of the District of Columbia Code prohibited Perpetual from engaging in the insurance brokerage or agency business and that Perpetual could not obtain a license because it could not truthfully answer Question 18 in the negative. He has advised the other directors of Perpetual that Perpetual must answer Question 18 "Yes" because, in his opinion, since Perpetual is unincorporated, the members would necessarily receive benefit from the increased income from the insurance commissions. As previously indicated this interpretation is inconsistent with that of the Superintendent of Insurance for the District of Columbia.

█ The evidence establishes that twelve District of Columbia building and loan associations other than Perpetual are currently licensed under 35 D.C. Code, Section 1336 to engage in the insurance agent's or brokerage business in the District of Columbia. Each of the associations shown to be licensed insurance agents or brokers in the District of Columbia answered Question 18 "No." The Superintendent of Insurance, the agency charged with administering the statute, has granted such licenses and has never questioned the "No" answer or otherwise challenged the legal right of building and loan associations to obtain licenses under the Fire and Casualty Act of 1940, and engage in the insurance business as agent and broker pursuant thereto. The interpretation given a statute by the agency charged with administering it is entitled to great weight. Very recently the Supreme Court of the United States reiterated this principle in the case of Leary v. United States, 395 U.S. 6, 7, 25, 89 S.Ct. 1532, 1542, 23 L.Ed.2d 57 (1969). It stated:

"We have often recognized that, as a general matter, a long-standing, contemporaneous construction of a statute by the administering agencies is 'entitled to great weight,' FTC v. Mandel Bros., 359 U.S. 385, 391, 79 S. Ct. 818, 823, 3 L.Ed.2d 893 (1959), and will be 'show[n] great deference,' Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 801, 13 L.Ed.2d 616 (1965)"

In addition, such evidence as may be found in this record on the question of "benefits" indicates that any benefits, direct or indirect, to the individual members of Perpetual who pay the insurance premiums are so remote as to be inconsequential. The benefits would inure to a strengthening of the association itself. The record contains opinions and vague hypotheticals concerning potential interest reductions for borrowing members, and possible benefits upon liquidation for investing members and possible increased dividend rates. However, there is nothing in the voluminous record of this case that establishes that, if licensed, more than 25 per centum of Perpetual's commission income would result from policies on which the premiums are paid or are to be paid by any *person* who receives or is to receive any benefit, direct or indirect from the commissions obtained. Plaintiffs recognize this fact when they seek damages only on behalf of the association and not for themselves. Perpetual's own trial counsel recognized it on page 3 of his memorandum of law on the issue of plaintiffs' standing to bring this action. He stated:

"The plaintiffs and members of their class cannot be damaged by any alleged mismanagement of the Association and, moreover, cannot benefit from any recovery or other relief which might be afforded to the Association in this action. The evidence will show that Perpetual is now paying 4¾% interest (or "dividends") on its deposits, the maximum amount allowed by law. 12 C.F.R. 526. Additional earnings of Perpetual are available to its members if, and only if, the Association dissolves. We submit that this Court may take judicial notice, and at any rate the evidence will show, that Perpetual has been in operation for 88 years and has assets in excess of five hundred million dollars and the likelihood of dissolution is so remote as to be virtually non-existent.

"Thus the plaintiffs and other members of their class have no pecuniary interest in the issue of whether the Association should or should not be in the insurance business. They would gain nothing by the entry of Perpetual into the sale of insurance and they have lost nothing by Perpetual's decision not to do so * * *."

█ Upon consideration of all of the above this court finds and concludes that the Fire and Casualty Act of the District of Columbia, enacted in 1940, specifically authorized building and loan associations, including Perpetual, to be licensed and to act as insurance agents and brokers; and that at the present

time Perpetual can and at all other times pertinent hereto Perpetual could legally and truthfully answer "No" to Question 18 on the Application for Broker-Agent License.

The Court further finds and concludes that in 1927 when Fidelity Corporation was organized and the referral of a portion of Perpetual's insurance business thereto began with consequent decrease in its commission income; in 1935, when the decision was made to take Perpetual completely out of the insurance business; in 1947 when Fidelity superseded Fidelity Corporation and became a recipient of insurance business generated through Perpetual; and in fact, from 1901 to the present time, no legal barrier has existed or exists to prevent Perpetual from lawfully procuring and retaining the necessary license to act in the District of Columbia as an insurance agent and broker and thereupon lawfully receiving insurance commissions from the placement of insurance on property securing Perpetual loans. The Court concludes also that the obtaining of such a license, engaging in the insurance business pursuant thereto, and collecting and retaining commissions as a result thereof would not have been and will not be ultra vires.

Turning to Perpetual's position in the State of Maryland, the Court finds that Perpetual began doing business in that State in 1949. It has not obtained nor attempted to obtain an insurance license in that State. The evidence establishes that no District of Columbia building and loan association is currently or has ever been licensed in its own name as an insurance agent or broker in the State of Maryland. Maryland does not permit a District of Columbia unincorporated association not primarily engaged in the insurance business to obtain an insurance agent or broker license in its own name. (Maryland Code, Art. 48A, § 168(a), (d)).

Maryland has issued resident and non-resident insurance licenses to certain *individuals* and the "trade name" file of the Maryland Insurance Department contains trade names of eight District of Columbia building and loan associations, i.e. eight or more individuals have been licensed by the State of Maryland as insurance agents or brokers who trade in the name of an association. The individual's license, however, does not show the trade name under which such individual conducts business. The commissions which technically are earned by the individual are received by the savings and loan association in whose name he trades.

An officer or employee of Perpetual could be licensed as an insurance agent or broker under the "trade name" statute in Maryland (Maryland Code, Art. 48A, § 168(e)) but such licensee could not legally turn over to Perpetual the commissions he earned because Maryland law makes it illegal for a licensed agent or broker to split commissions with any unlicensed party (Maryland Code Art. 48A § 167(c) ). Maryland law also requires that a licensed partnership or corporation must be principally engaged in the insurance business.

■ The Court concludes as a matter of law that Perpetual could not and cannot lawfully secure an insurance agent's or broker's license in the State of Maryland and that if an individual licensed under Maryland law to conduct such business were to transfer his commissions to Perpetual, such transfer would contravene Maryland law, even though such licensee traded under the name of "Perpetual Building Association".

■ With respect to the State of Virginia, Section 38.1–315 of the Code of Virginia specifies that only individuals, partnerships or corporations may be licensed. These categories do not include "unincorporated associations" such as Perpetual and, therefore, Perpetual cannot lawfully obtain a Virginia non-resident broker's license in its own name. It also would be unlawful under the Code of Virginia for a licensed individual to share all or part of his commissions with an unlicensed association.

Article 38.1–289 of the Virginia Code provides in substance that no resident agent shall allow or pay to any person not licensed in Virginia as a resident agent or as a non-resident broker any part of any commission which such agent receives. This prohibition would make it unlawful for Perpetual to receive commissions on insurance written on Virginia properties so long as it is not licensed in that state. There is nothing in the Code of Virginia to prevent an unincorporated association such as Perpetual from forming a subsidiary corporation to become licensed under the laws of Virginia for the purpose of handling the insurance needs of the association. The Court concludes as a matter of law, however, that the formation of such a subsidiary corporation and the holding of the stock thereof for the sole purpose of acting as insurance agent or broker in the State of Virginia are beyond the incidental powers of Perpetual.

There is no conflict between the position of Mr. Baltz with Perpetual and his position with Fireman's Insurance Company with which Fidelity places a substantial amount of insurance. Mr. Baltz owns 646 shares of Fireman's stock (less than 2 percent). He first acquired such stock about 40 years ago and the shares have a current market value of $35.00 and pay annual dividends of $1.40. Mr. Baltz is Chairman of the Board of Fireman's without any duties and receives a directors fee of $100.00 per meeting— there are four per year—and an annual salary of $2,000.00. Fireman's Board is made up of some 30 members who are largely from the savings and loan and banking businesses. Fidelity places insurance with Fireman's because it is a local company with whom relations over the years have been excellent. Fireman's suffered a net loss of $301,000.00 on insurance of properties securing Perpetual loans during the period of 1960 through 1966.

The issue to be determined here as in any corporate opportunity case is whether the line of endeavor undertaken by the directors "was so closely associated with the existing and prospective activities of the corporation that the defendants should fairly have acquired that business for or made it available to the corporation." Rosenblum v. Judson Eng'r Corp., 99 N.H. 267, 109 A.2d 558 (1954).

■ Whether a business opportunity is a corporate one or one within the legitimate scope of the individual interests of the directors depends upon the facts and circumstances of the case. Alvest, Inc. v. Superior Oil Corporation, 398 P.2d 213 (Alaska 1965) and cases cited therein. The circumstances to be considered are those which were present when the opportunity arose without regard to events subsequently occurring. Diedrick v. Helm, 217 Minn. 483, 14 N. W.2d 913, 153 A.L.R. 649 (1944).

■ Upon the facts and circumstances of this case hereinbefore set forth the Court finds and concludes as a matter of law that with respect to the insurance agency or brokerage business in the State of Maryland and the Commonwealth of Virginia, plaintiffs have failed to show the existence at any time of a corporate opportunity for Perpetual to engage in such activity. It follows that there has been no usurpation of such opportunity in those States by the Defendant directors.

■ A different situation exists, however, with respect to the District of Columbia. This Court has already found that under its constitution and by-laws Perpetual may, as one of its incidental powers, qualify for placing and place hazard insurance to protect Perpetual's security on loans made by it to its members and collect the commissions from such activities. It has also found that from 1901 to the present time no legal barrier has existed to prevent Perpetual from lawfully procuring and retaining the necessary license to act in the District of Columbia as an insurance agent and broker and thereupon lawfully receiving insurance commissions from the placement of hazard insurance on properties securing Perpetual loans. In-

asmuch as placing insurance for a commission was an actual part of Perpetual's business from at lease 1912 to 1935 and inasmuch as no legal barrier prevented Perpetual from securing a license legitimatizing its insurance placement for commission operation during that period or at any other time, the Court finds as a fact and concludes as a matter of law that a corporate opportunity to conduct the business of a licensed insurance agent or broker in the District of Columbia existed in 1927, 1935, 1947, and at all times in between those dates, and continues to exist to the present day.

Based upon all of the foregoing this Court finds and concludes that the aforementioned corporate opportunity belonging to Perpetual was usurped by its directors in 1927, when they organized Fidelity Corporation and began diverting the insurance business previously conducted by Perpetual to Fidelity Corporation; in 1935, when they caused Perpetual to discontinue all placement of insurance for commissions while continuing to divert insurance business generated through Perpetual to Fidelity Corporation; and in 1947, when they dissolved Fidelity Corporation but organized Fidelity partnership and continued to divert to themselves as partners insurance business generated through Perpetual. The Court further finds that the nine individual defendants, who are the present directors of Perpetual and the general partners in Fidelity are continuing at present to usurp a corporate opportunity of Perpetual by failing to qualify Perpetual to act as insurance agent and broker in the District of Columbia to place and write hazard insurance for commissions on properties securing Perpetual loans while diverting such insurance business to themselves as partners in Fidelity, and, unless enjoined, they will continue to usurp said corporate opportunity and divert said business to themselves, and Perpetual will suffer irreparable injury.

Accordingly, the individual defendants as Directors of Perpetual have breached the fiduciary duty owed by them to Perpetual. As stated by the Supreme Court of Alaska in *Alvest, Inc., supra*:

"A corporate officer or director stands in a fiduciary relationship to his corporation. Out of this relationship arises the duty of reasonably protecting the interests of the corporation. It is inconsistent with and a breach of such duty for an officer or director to take advantage of a business opportunity for his own personal profit when, applying ethical standards of what is fair and equitable in a particular situation, the opportunity should belong to the corporation. Where a business opportunity is one in which the corporation has a legitimate interest, the officer or director may not take the opportunity for himself. If he does, he will hold all resulting benefit and profit in his fiduciary capacity for the use and benefit of the corporation." (398 P.2d 213, 215, citing cases).

The Court has not made and will not make a finding of bad faith on the part of these individual defendants, because, in this Court's view, good faith is not an issue in this case. As stated by the Supreme Court of New Hampshire, in *Rosenblum, supra*:

"When officers or directors act in bad faith in acquiring or developing business opportunities for themselves, as in those cases in which funds or resources of the corporation or confidential knowledge or information gained by them in their official capacities have been utilized, (Gamlen Chemical Co. v. Gamlen, D.C., 79 F.Supp. 622; Lutherland, Inc. v. Dahlen, 357 Pa. 143, 53 A.2d 143), fair play clearly calls for the imposition of a trust in favor of the corporation. *It does not follow, however, that bad faith is essential to the establishment of a duty on the officers and directors of a corporation in connection with business opportunities which they have acquired for themselves.* 3 Fletcher, Corporations, § 856. The fact that a business opportunity is itself of such

a nature that under the particular circumstances of the case it should fairly belong to the corporation is sufficient to establish a duty upon the officers and directors to acquire it for the corporation." 109 A.2d 558, 563. (emphasis supplied).

And in *Alvest, Inc., supra,* the Supreme Court of Alaska stated:

"A showing of bad faith is not essential to establish a duty on the part of officers or directors in connection with business opportunities which they wish to acquire for themselves." 398 P.2d 213, 216.

The individual defendants herein will be enjoined from continuing to usurp the corporate opportunity found to exist in this case and from diverting the hazard insurance business generated through Perpetual to themselves. Punitive damages will not be allowed. The cause will be set for further hearing on the questions of compensatory damages and counsel fees. However, the Court determines pursuant to Rule 54(b) of the Federal Rules of Civil Procedure that there is no just reason for delay and directs the entry of judgment for the relief herein granted.

This Memorandum Opinion shall constitute the findings of fact and conclusions of law. Counsel will present a proposed order in conformity herewith.